IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 15, 2011 Session

## STATE OF TENNESSEE v. KRISTIE M. SMITH

**Direct Appeal from the Criminal Court for Knox County**
**No. 86588      Richard Baumgartner, Judge**

**No. E2010-00549-CCA-R3-CD - Filed November 14, 2011**

Defendant, Kristie M. Smith, was indicted by the Knox County Grand Jury for the first degree premeditated murder of her boyfriend, Curtis Phoenix. Following a jury trial, Defendant was convicted as charged and sentenced to life imprisonment. On appeal, Defendant asserts that: 1) the evidence was insufficient to sustain her conviction; 2) the admission into evidence of Defendant's recorded phone calls from jail was error; 3) the admission into evidence of letters written by the Defendant while in jail was error; and 4) Defendant received the ineffective assistance of counsel at trial. After a thorough review of the record before us, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., joined. DAVID H. WELLES, SP.J., not participating.

Robert R. Kurtz, Knoxville, Tennessee, for the appellant, Kristie M. Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

*Facts*

Defendant and the victim, Curtis Phoenix, lived together in a trailer park on Holston Drive in Knoxville. The victim was a known drug dealer. Defendant had four children, the youngest of which was fathered by the victim. Defendant's two daughters, ages 4 and 6, were in the custody of Defendant's grandmother, Linda Estridge.

On Sunday, January 14, 2007, the victim took Defendant to Ms. Estridge's residence to visit her daughters.  At some point, Defendant left there and went to her mother's boyfriend's house, where she smoked crack cocaine with her mother, Sherry Agee.  Ms. Agee took Defendant home around 7:30 p.m.  When they arrived, the victim was upset.  Ms. Agee testified that the victim did not approve of Defendant smoking crack, and that he could tell Ms. Agee was "high."  She heard Defendant and the victim argue, and she heard the victim tell Defendant to "hit the road with the babies."  Defendant called Ms. Agee later that night at around 10:00 or 10:30 p.m.  Defendant said that she was taking one of her sons to the emergency room and asked if Ms. Agee would go with her.  Defendant arrived at her mother's house driving the victim's Jeep Cherokee, which the victim did not allow her to drive.  Defendant also had the victim's cell phone, cash and crack cocaine.  Defendant never took either of her sons to the emergency room.  Rather, Defendant and Ms. Agee took the children to Ms. Estridge's house, and Defendant and Ms. Agee then drove around and rented a motel room at the Red Carpet Inn, where they smoked crack cocaine together.  Defendant was crying, but she did not tell her mother what was wrong.  They left the motel and went to Western Heights Apartments, where they continued to smoke crack cocaine.  The next morning, as Ms. Agee was leaving the apartments, she was stopped in the alley by police and arrested for trespassing and being in possession of crack cocaine.  She did not hear from Defendant again until the following day.  Defendant called Ms. Agee on Tuesday evening, and Ms. Agee was concerned for her daughter.

Linda Estridge, Defendant's grandmother, testified that on Sunday evening, the victim had brought Defendant to her house.  Defendant's mother picked her up and later took her back home.  Defendant called her that night and told her that the victim was angry because Defendant had been with her mother.  Defendant asked Ms. Estridge to talk to the victim.  Ms. Estridge talked to the victim, and the victim threw down the phone.  Ms. Estridge then heard what sounded like someone being pushed into the refrigerator.  On Wednesday morning, January 17th, Ms. Estridge picked up Defendant from Western Heights Apartments and took her to the trailer where Defendant and the victim lived.  Ms. Estridge testified that Defendant went inside and came back out with a basket of CDs and a DVD player and asked if she knew anyone who wanted to buy them.  Ms. Estridge took Defendant back to Western Heights Apartments.  Ms. Estridge testified that Defendant's behavior  was "erratic, very nervous, [and] agitated."  Defendant began crying and "broke down" and told Ms. Estridge that she had shot the victim.  Ms. Estridge drove back to Defendant's trailer and looked through the window.  She saw the victim lying on the couch, covered by a blanket, and she called the police.

Kimberly Price of the Knoxville Police Department took photos of the crime scene.  She testified that there was blood pooled around the victim and blood splatter around the victim.  She found spent shell casings and bullets around the area where the victim's body

was and an empty gun holster in the victim's bedroom. She also found a receipt from McDonald's and a McDonald's bag in the trash.

The medical examiner, Darinka Mileusnic-Polchan, testified that she examined the victim's body at the crime scene. There were blankets and pillows covering his head and body, and they appeared to be clean. There was blood on the sofa, wall and floor around the body. The body had been there for several days and was decomposing. Defendant had been shot five times in the top of the head and the side of the face and neck. She testified that he did not die immediately, and that there was a time period between having been shot and dying in which he aspirated on his own blood. She examined the victim's stomach contents and found food matching that on the receipt from McDonald's. She testified that the victim had eaten within an hour before the shooting. She did not find any evidence of a struggle. She recovered a bullet from the victim's jaw and a bullet jacket fragment from his brain. The evidence did not suggest that the shots were fired from within three feet. A toxicology report concluded that Defendant did not have drugs or alcohol in his system at the time of his death.

Allen Norris lived across the street from Defendant and the victim and worked with the victim. He knew the victim sold marijuana and crack cocaine, and he testified that the victim kept marijuana in his freezer. He testified that Defendant had made an allegation in October, 2006, that the victim, a former boxer, had punched her twice in the face, but he never saw her with bruises or a black eye. He never saw the victim abuse Defendant or her children. He testified that the victim did not show up for work on Monday, January 15th, and Defendant called and left a message that the victim had fallen and broken his ankle and she was taking him to the hospital. Mr. Norris saw Defendant two days later getting into her grandmother's van with a stack of DVDs. He asked her which hospital the victim was at, and Defendant told him that she had dropped off the victim at Baptist. She then stated that the victim was at St. Mary's Hospital.

Julie Campbell testified that she met Defendant for the first time while Ms. Campbell was at Western Heights Apartments. She testified that they smoked a "large quantity" of crack cocaine together. Defendant had "thousands" of dollars in cash and a large amount of crack. Defendant told Ms. Campbell that she had shot and killed the victim and taken his money, drugs, and guns. Defendant told her that she had shot him in the head while he was sleeping, covered his head with a pillow and shot him three more times in the head. Defendant said that she had put the two guns she used, a .380 and a .45 caliber pistol, into a diaper bag and threw them out close to East Town Mall. Defendant told Ms. Campbell that three days after the shooting she had called her grandmother to come get her and take her back to her trailer to get the victim's DVDs and marijuana. Ms. Campbell testified that Defendant did not appear remorseful at all, but that she began crying after she ran out of crack cocaine.

On Wednesday, January 17, 2007, Officer Jonathan Chadwell was dispatched to the Western Heights Apartments to look for Defendant. When he found Defendant, she gave him a false name, being the name of one of her daughters. Defendant did not have any money or drugs in her possession.

Arthur Parris, an employee of the Knoxville Utilities Board, found a bag on the side of the road near East Town Mall at approximately 1:00 p.m. on January 17, 2007. He stopped and opened the bag and found two handguns inside. The guns were cocked and loaded. Mr. Parris called the police.

Police did not find any latent fingerprints on the guns. Patty Resig, of the Knoxville Police Department forensic unit, examined a .380 caliber handgun and a .45 caliber handgun, and the casings and bullets recovered from the crime scene. She determined that a .45 caliber cartridge case and two .380 caliber shell casings were fired from the pistols. There were two .45 caliber bullets and two .380 caliber bullets that she could not positively identify as having been shot from the handguns, but they all had the same class characteristics and some individual characteristics.

Following her arrest, Defendant wrote a letter dated February 21, 2007, to Kendrick Hughes. The letter states:

> Things are not looking good for me. [ ] I'll be lucky to get second-degree because of the bullets went in execution style. So I'm going to tell them some shit to get heat of passion crime. Shit, you know, a bitch got to do what a bitch got to do to get back to her young'ns. For example, I might say he slept with someone who had AIDS or something and told me to deal with it. Wouldn't that make you made enough to kill? I know it would me.

Defendant's probation officer, Tara Richardson, testified that she was aware of a domestic assault by the victim against the Defendant. She testified that Defendant was "obviously afraid" of the victim. Defendant had told her that the victim had abused her while she was pregnant. She last met with Defendant on January 5, 2007. Defendant was scheduled to meet with Ms. Richardson on January 16, 2007, but Defendant did not show up.

In another letter written by Defendant from jail to Kendrick Hughes on February 5, 2007, which was introduced during the State's rebuttal, Defendant wrote:

> I'm a bad ass white girl posted on your block. When you see me coming through, I'll be slinging them rocks. Bitch, don't get me twisted because I ain't no fucking cop, and I've always got a stash of that perp in my socks.

When I'm rollin' in the hood, I'll be on them 22s, and if you step up to me, I'll make your blood spill. Always what you think. I've got skills. They are just a little rusty.

*Motion for New Trial*

At a hearing on Defendant's motion for new trial, Defendant's trial counsel testified that he had been a practicing attorney in Tennessee for 13 or 14 years, and that his only area of practice was criminal defense. Counsel was appointed to represent Defendant in January, 2007. Counsel met with Defendant in jail. Counsel was aware that Defendant had a history of drug use, specifically crack cocaine, and that she did not have a high school education. Counsel agreed to waive Defendant's preliminary hearing in general sessions court in exchange for "open file discovery" by the prosecutor. Counsel viewed a videotaped interview by detectives of Linda Estridge, Defendant's grandmother, in which Ms. Estridge described Defendant as bipolar. Counsel was also aware that Defendant had requested to see the jail psychiatrist to obtain medication, and in a letter she wrote, she stated that she would lie in order to get medication. Counsel was not aware of Defendant's medical or psychiatric history involving suicide attempts, hospitalizations, and depression, and he did not request Defendant's medical records. Counsel did not file a motion to have Defendant evaluated to determine her competency to stand trial. Counsel testified that he never suspected that Defendant's mental health might be an issue because she never exhibited any signs or behaviors that would so indicate.

Counsel filed pretrial motions seeking to exclude from evidence Defendant's phone calls from jail. Counsel also sought to exclude letters written by Defendant while in jail. Counsel specifically objected to the portion of one of the letters written by Defendant, which states: "Things aren't looking good for me. My lawyer said I'd be lucky to get second degree because one of the bullets went in execution style." Counsel argued that by allowing into evidence what a defendant claims her attorney advised her would potentially compromise the attorney/client relationship. The trial court agreed and redacted the phrase "[m]y lawyer says" from the letter that was introduced into evidence. Counsel did not believe the letter created a conflict of interest requiring his withdrawal as counsel. Counsel's theory of defense at trial was that Defendant was abused by the victim and that the shooting was done in the heat of passion. In preparation for trial, counsel interviewed potential witnesses, but determined that those witnesses would be more harmful than helpful to Defendant's case. Counsel acknowledged that the proof of abuse was weak. Counsel attempted to have Defendant's letters from jail excluded and was successful in excluding several, but one letter was ultimately admitted as rebuttal to Ms. Estridge's testimony that Defendant was a "good girl."

Psychologist Kathryn Smith testified that she was contacted by Defendant's post-trial counsel to evaluate Defendant. She prepared a report based on her evaluation. In preparing her report, Dr. Smith obtained Defendant's medical records dating back to age 11. Defendant had been diagnosed with "depression and psychotic disorder, not otherwise specified." Defendant's medical records revealed that just days prior to the offense, Defendant had reported "homicidal ideation and major depression" at a postpartum checkup. Dr. Smith testified that Defendant had responded well to medications prescribed to her after the conviction.

Dr. Smith diagnosed Defendant with "bipolar disorder" and testified that her mental state at the time of the offense could have prevented her from forming premeditation and intent. Dr. Smith also testified, however, that in her reports, she concluded that "[Defendant] was not a reliable informant during the forensic interview and testing"; that she "over[-]reported and exaggerated her symptoms and problems in the MMPI II, and she exaggerated and fabricated symptoms on the MPS"; and that Defendant's letters and phone calls from jail do not "corroborate [her] description of her mental state at the time of the offense." Based on two psychological tests administered by Dr. Smith and all of the information she reviewed, Dr. Smith found evidence that Defendant was malingering or exaggerating her psychological problems. Dr. Smith testified on cross-examination as follows:

> Q: And, again, just to be clear, sitting here today, can you say that at the time of the offense that Ms. Smith could not form the intent to commit premeditated first-degree murder?
>
> A: I can't say. The best I can do is say that what I said in my report which is "could have," and the – I think it – it goes back to "free from excitement and passion." And so I – really the best I could do is say that having bipolar disorder and untreated bipolar disorder, being under the influence of substances, that could preclude somebody from being able to premeditate.
>
> Q: Okay. And, again, that is if she was under the influence of – of a narcotic. If there was no proof that she was under the influence of narcotics, then how would that impact your decision?
>
> A: Well, she still has raging bipolar disorder. It's – it's very possible for somebody with bipolar disorder to not [sic] reflect and make a judgment. There's – like I said earlier, there's the impulse and the action and nothing in between, and so that – that could be there whether they have influence of drugs and alcohol or not. I mean,

that's – you know, that's kind of a known issue with bipolar disorder.

Q:      I guess let me ask it like this.  Just because a person has bipolar disorder does that prevent them from committing an intentional act?

A:      No, it does not.

Regarding the offense, Defendant told Dr. Smith that she and the victim had been arguing and she became very upset.  She stated that she got one of the victim's guns from the bedroom and attempted to shoot herself, but the gun did not fire because the safety was on. She then began firing in the direction of the room where the victim was sitting on the couch eating his food.  Dr. Smith acknowledged that the crime scene photographs and diagram were not consistent with Defendant's account of what happened.

Attorney James Logan testified as an expert in criminal law.  Mr. Logan testified that he was contacted by Defendant's post-trial counsel to give an opinion regarding trial counsel's performance at trial.  Mr. Logan testified that he believed that the evidence at trial did not support trial counsel's theory that Defendant was a "battered woman," and therefore, counsel's presentation of the theory to the jury was damaging to Defendant's case.  Mr. Logan testified, "it's obvious in this case that [trial counsel] did not have a position relative to this case that would be supported by the evidence. . . ."  He also testified that counsel's failure to develop at trial Defendant's mental health history and substance abuse at the time of the offense was deficient.  Mr. Logan believed that, based on the evidence, the only viable defense in this case was that of diminished responsibility.  He met with Defendant and, based on his observations, determined that she had "classic symptoms of what I call 'bipolar dysfunction.'"  Mr. Logan testified that trial counsel's failure to request a jury charge on intoxication was also deficient.

Mr. Logan believed that Defendant's letters from jail created a conflict of interest because she attributed certain statements to her trial counsel.  He explained that Defendant's reference to a "heat of passion" defense without the reference to her trial counsel created the impression that Defendant was making up a defense.  In Mr. Logan's opinion, the decision to redact the phrase "[m]y lawyer says" adversely affected Defendant's case.

*Analysis*

I.      Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence and argues that the State failed to prove the element of premeditation beyond a reasonable doubt. When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39–13–202(a)(1). "Premeditation" is defined in our criminal code as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39–13–202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. *See State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of

a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. *Jackson*, 173 S.W.3d at 409; *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *Leach*, 148 S.W.3d at 54; *Nichols*, 24 S.W.3d at 302; *Bland*, 958 S.W.2d at 660.

Viewed in the light most favorable to the State, the evidence established that Defendant shot the unarmed victim five times in the head while he was sleeping. She admitted the shooting to at least two people. The medical examiner opined that the shooting was "overkill" and that any one of the shots would have killed the victim. Defendant left the house with Defendant's money, drugs and vehicle. Defendant disposed of the guns used to commit the murder on the side of the road and lied to police about her identity. She also called the victim's employer and gave a false story explaining his absence from work. Defendant used all of the money and drugs she took from the trailer and went back two days later to get more of the victim's property to sell or trade for drugs.

Defendant made several incriminating statements from jail. In one call, she berated her grandmother for having talked to investigators and demanded that she change her story at the preliminary hearing. In another call to her mother, she threatened to incriminate Ms. Estridge as an accessory to the murder. Defendant expressed no remorse for the killing. In one call, she asked if there was a lot of blood in the trailer. Then she remarked that she "shot him with a .45 with hollow tips" and laughed. In a letter Defendant wrote from jail, she indicated that she was going to lie in order to get the charge reduced from first degree murder.

We conclude that the evidence at trial is sufficient to support Defendant's conviction for first degree premeditated murder. Defendant is not entitled to relief on this issue.

II.    Admissibility of Defendant's telephone calls and letters

Defendant asserts that the trial court erred by admitting the recorded phone calls made by Defendant from the Knox County Detention Facility following her arrest in this case. Defendant contends that without the admission of the recordings, Defendant "would have been acquitted, or at the very least, the jury's decision making would have been affected." Defendant argues that the admission into evidence of the phone calls violates Tennessee's wiretapping statute and our state and federal constitutions.

At a pretrial hearing, defense counsel stated that he intended to file a motion seeking to exclude from evidence the phone calls that Defendant had made from jail. Defense counsel stated, "I can't really complain about the ones [the Assistant District Attorney]

selected," but that he would file a motion to preserve his objection "in case the law ever changes." The trial court noted that the phone calls were statements that Defendant had made, and they appeared to be admissible. Defense counsel objected to the foul language used in the calls. Defendant later filed a "Motion to Preclude Use of Telephone Calls" obtained while Defendant was incarcerated. In the motion, defense counsel argued that Defendant had an expectation of privacy and that the taping of the calls violated her Fourth Amendment right against illegal seizures and her First Amendment right to freedom of speech. Defendant did not cite any case law supporting her arguments in the motion.

At a subsequent hearing, defense counsel objected to the introduction of the phone calls. He acknowledged that a detention facility can monitor calls for security purposes, but he stated that he did not want to waive the argument if the case law ever changed. The trial court denied Defendant's motion, ruling that the calls were admissible because they were voluntarily made by Defendant and incriminating.

In her motion for new trial, Defendant claimed for the first time that the recording of her phone calls from jail violates Tennessee's wiretapping statute. In denying Defendant's motion for new trial, the trial court found that Defendant had no expectation of privacy as she was told that the call would be recorded. The State asserts that Defendant has waived this issue because she did not raise it at trial. *See* Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

Nevertheless, we conclude that the recordings were lawfully intercepted. Tennessee Code Annotated § 40-6-302(b) provides that "[t]he interception of wire, oral or electronic communications, . . . when no party to the communications has consented to the interception, should be allowed only under compelling circumstances when authorized and supervised by a court of competent jurisdiction and upon a finding of probable cause." Tenn. Code Ann. § 40-6-302(b). The Act provides for certain exceptions:

> It is lawful under §§ 39-13-601 – 39-13-603 and title 40, chapter 6, part 3 for a person acting under the color of law to intercept a wire, oral or electronic communication, where the person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Tenn. Code Ann. § 39-13-601(b)(2).

At the beginning of each of Defendant's phone calls, a recorded voice informs both parties to the conversation that the call may be recorded at any time. Thus, Defendant "implicitly consented to the interceptions by continuing with the call after the recorded warning." *See State v. Ivan Charles Graves*, No. E2009-00009-CCA-R3-CD, 2011 WL 398024 at *16 (Tenn. Crim. App. at Knoxville, filed Feb. 8, 2011), *perm. app. denied* (Tenn. May 27, 2011).

Defendant also argues that the recorded phone calls constitute an illegal seizure in violation of the Fourth Amendment. Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and that any evidence discovered is subject to suppression. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "The interception of a conversation in which a person has a reasonable expectation of privacy constitutes a search within the meaning of the Fourth Amendment." *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001) (citing *Katz v. United States*, 389 U.S. 347, 353 (1967). To properly evaluate the issue under both our state and federal constitutions, we must determine "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *Id*. (citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001)).

Again, we agree with the trial court that Defendant had no reasonable expectation of privacy. The recorded calls themselves establish that a recorded voice informed Defendant and the recipient of the call that the call was being recorded. Furthermore, testimony at trial established that while in jail Defendant was provided a personal identification number to use when placing the calls. Based on the evidence, we cannot conclude that Defendant had any reasonable or legitimate expectation of privacy. Considering whether Defendant's subjective expectation of privacy is reasonable and justifiable as viewed by society as a whole, as this Court recently held, "we cannot agree that society would deem reasonable an expectation that calls placed from jail would remain private." *State v. Hill*, 333 S.W.3d 106, 126 (Tenn. Crim. App. 2010).

Defendant also contends that the recorded phone calls violate her Sixth Amendment right to counsel pursuant to *Massiah v. United States*, 377 U.S. 201 (1964). The State responds that Defendant has waived this issue by failing to raise it pre-trial. See Tenn. R. App. P. 36(a). While Defendant objected to the phone calls at trial, she did not do so on the basis of the Sixth Amendment. We have held that a defendant waives an issue when he changes theories from the trial court to the appellate court. *State v. Dooley*, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000). Nevertheless, we will address the issue.

-11-

Under *Massiah*, once the Sixth Amendment right to counsel has attached, it guarantees the accused the right to rely on counsel as a "medium" between the accused and the State. 377 U.S. 201 (1964). Thus, police may not deliberately elicit information from an accused unless his right to counsel is waived. In order to determine whether there has been a *Massiah* violation, a court must first determine (1) whether adversary proceedings had commenced; (2) whether the informant was a government agent; and (3) whether the agent "interrogated" the appellant within the meaning of *Massiah*. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Defendant argues that through the recording of inmate phone calls, "the state intentionally creates a situation likely to induce defendants into making statements that the state either uses for tactical purposes or to introduce as evidence in the case for which the right to counsel has arisen." We disagree. While Defendant correctly asserts that an incarcerated individual retains his or her right to free speech, "First Amendment rights, like many other rights, are circumscribed in the prison setting." *Dobbins v. Tennessee Dept. of Correction*, No. 2010-00009-COA-R3-CV, 2010 WL 4225822, at *5 (Tenn. Ct. App. Oct. 25, 2010). Although Defendant was required to use the jail phones, she was not induced to make any statements about the case. Defendant is not entitled to relief on this issue.

Next, Defendant asserts that the trial court erred by allowing the State to introduce into evidence portions of two different letters written by Defendant while she was incarcerated awaiting trial.

At a pretrial hearing, Defendant sought to suppress two letters written by Defendant from jail. Defense counsel argued that the letter in which Defendant wrote what the prosecutor called a "rap" song was prejudicial. Counsel acknowledged that mail sent from a jail may be monitored for security purposes but asserted that Defendant had an expectation of privacy and that use of the letters, absent a compelling state interest, violated her constitutional rights to free speech and to be free from unreasonable searches and seizures under the First and Fourth Amendments. Counsel acknowledged that case law did not support his argument, but explained to the trial court that he was objecting to the admission of the letters in the event that the law ever changed.

The prosecutor argued that the first letter, dated February 5, 2007, was relevant under Tennessee Rule of Evidence 402 because it showed intent and premeditation in that Defendant wrote about taking the victim's money and drugs and going to Miami or California. The prosecutor argued that the letter established that theft was Defendant's

motive for killing the victim. Defendant responded that Defendant had not been charged with felony murder and that, according to the letter, the theft of the money appeared to be an afterthought. The trial court agreed with Defendant and excluded the letter because it referred to Defendant's prior bad acts.

During the trial, the State moved to introduce a portion of the February 5th letter, which the court had previously ruled was inadmissible, arguing that the letter would rebut testimony from Defendant's grandmother, Linda Estridge, that Defendant was afraid of the victim and that she was a good person. Defendant responded that the letter was prejudicial. The trial court ruled that the letter could be introduced because the issue of Defendant's good character had been raised by a witness for the defense. The portion of the letter that was admitted states:

> I'm a bad ass white girl posted on your block. When you see me coming through, I'll be slinging them rocks. Bitch, don't get me twisted because I ain't no fucking cop, and I've always got a stash of that perp in my socks. When I'm rollin' in the hood, I'll be on them 22s, and if you step up to me, I'll make your blood spill. Always what you think. I've got skills. They are just a little rusty.

As to the second letter that the State sought to introduce, which was dated February 21, 2007, the prosecutor argued that it was relevant to show Defendant's intent to fabricate a defense. The letter states:

> Things are not looking good for me. My lawyer said I'll be lucky to get second-degree because the bullets went in "Execution Style!" So I'm going to tell them some shit to get the "Heat of Passion Crime." Shit, ya know, a Bitch gotta do what a bitch gotta do to get back to her youngins. For example, I might say he slept w/ someone who had AIDS or something and he told me to deal with it! Wouldn't that make you made enough to kill? I know it would me!

Defense counsel objected to the letter as prejudicial and expressed concern about the portion of the letter that references him. The State agreed to redact that portion, and the trial court ruled that the letter could be introduced at trial. The parties stipulated that Defendant wrote the letter.

On appeal, Defendant asserts that the trial court erred in admitting the letters based on several provisions of our state and federal constitutions and several rules of evidence. We review a trial court's decisions about the admissibility of evidence for an abuse of discretion.

*State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id*. (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

With regard to the constitutionality of the seizure of the letter, we agree with the trial court that Defendant did not have a reasonable expectation of privacy. We will apply the two-part analysis articulated in *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001). While Defendant may have had a subjective expectation of privacy in that the letter was intended for a particular individual (*see State v. Archie Vaughn Montague*, No. 02C01-9502-CC-00044, 1996 WL 417663 (Tenn. Crim. App. at Jackson, filed July 26, 1996), perm. app. denied (Tenn. Jan. 27, 1997) (held there was no subjective expectation of privacy where the defendant left a suicide note in his jail cell)), and, unlike the phone calls from jail, there is nothing in the record to establish that Defendant was warned that the letter could be intercepted, we do not believe that society would recognize Defendant's expectation of privacy as reasonable. The Tennessee Supreme Court has determined that prisoners do not have a "reasonable or legitimate expectation of privacy" in the confines of a prison cell. *State v. Dulsworth*, 781 S.W.2d 277, 284 (Tenn. 1989) (citing *Hudson v. Palmer*, 468 U.S. 517, 525-526 (1984)).

As to the relevance of the evidence, Tennessee Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant and otherwise admissible evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, . . . ." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) provides that evidence of other crimes or acts, although not admissible to prove the character of a person in order to show action in conformity with the character trait, may be admissible for other purposes. The trial court must determine in a jury-out hearing whether there is a material issue other than conduct conforming with the character trait, and must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b); *State v. West*, 844 S.W.2d 144, 149 (Tenn. 1992). Generally, this rule is one of exclusion, but there are exceptions. *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999). The generally recognized exceptions to the rule allow evidence offered to prove motive, identity, intent, absence of mistake, opportunity, or a common scheme or plan. *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980). Additionally, the State may be allowed to introduce evidence of a

"pertinent" character trait of the defendant when the defendant "opens the door" by introducing evidence of his or her good character. See Tenn. R. Evid. 404(a)(1).

In the February 21st letter, Defendant stated that she was going to lie in order to establish that she committed the offense in the heat of passion rather than, as the State alleged, with premeditation. We believe this evidence is relevant to the issue of Defendant's intent. Defendant has not established how this evidence is more prejudicial than probative to Defendant's intent.

As to the February 5th letter, the State asserts that Defendant opened the door to presentation of rebuttal character evidence when Ms. Estridge testified that Defendant was a "good girl" and that the victim had been physically abusive towards Defendant. Defendant's probation officer, Tara Richardson, also testified for the defense that Defendant was afraid of the victim. We agree with the State that the letter was relevant to rebut testimony that Defendant was a "good girl" and a victim of abuse.

The trial court did not abuse its discretion by admitting the letters into evidence. Defendant is not entitled to relief on this issue.

III.    Ineffective Assistance of Counsel

In her final issue on appeal, Defendant contends that the trial court erred by denying her motion for new trial on the basis that she received the ineffective assistance of counsel at trial. Specifically, Defendant asserts that counsel was deficient for failing to investigate and present a mental health defense and an intoxication defense, by not withdrawing as counsel based on the introduction of letters written by Defendant that referenced counsel, and by failing to adequately develop "a theme, plan, or theory of defense" at trial.

We first note that claims of ineffective assistance of counsel are generally more appropriately raised in a petition for post-conviction relief rather than on direct appeal. *See State v. Carruthers*, 35 S.W.3d 516, 551 (Tenn. 2000). This Court has consistently "warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant amount of development and fact finding such an issue entails." *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999). Raising the issue of ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). This peril is two-fold. First, ineffective assistance can rarely be established without an evidentiary hearing. *See Strickland v. Washington*, 466 U.S. 668, 689-90, 694, 104 S.Ct. 2052, 2065, 2067, 80 L.Ed.2d 674 (1984). Post-conviction procedures afford an evidentiary hearing to a Defendant with colorable claims. See T.C.A. §§ 40-30-109(a),-110 (2006). Second,

raising the issue in the direct appeal could result not only in losing on appeal, but also in barring the claimant from raising the issue later in the post-conviction arena. T.C.A. §§ 40-30-106(f) & (h) (2006). A post-conviction claim for ineffective assistance of counsel will be dismissed where that claim has previously been determined by another court. T.C.A. § 40-30-106(f). "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." T.C.A. § 40-30-106(h). However, because there is nothing barring a defendant from bringing an ineffectiveness claim in a direct appeal, we will proceed with our analysis of Defendant's claim.

Under Tennessee Code Annotated section 40-30-110(f) (2003), a defendant seeking post-conviction relief on the basis of ineffective assistance of counsel is required to prove his or her allegations "by clear and convincing evidence." This same standard applies even when the claim of ineffective assistance of counsel is raised on direct appeal. *State v. Burns*, 6 S.W.3d 453, 461 n. 5 (Tenn. 1999) (citing *State v. Anderson*, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992)). The factual findings are conclusive unless the defendant establishes that the evidence preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). For a defendant to successfully overturn a conviction based on ineffective assistance of counsel, the defendant must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the defendant must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). The defendant is not entitled to the benefit of hindsight; the defendant may not second-guess a reasonably based trial strategy; and the defendant may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. *Adkins v. State*, 911 S .W.2d 334, 347 (Tenn. Crim. App. 1994); *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

On appeal, this Court reviews a trial court's findings of fact de novo with a presumption that those findings are correct, unless the record preponderates against the actual findings. *State v. Fields*, 40 S.W.3d 450, 456-58 (Tenn. 2001). This Court may not reweigh the evidence or substitute its own inferences for those drawn by the trial court, and questions concerning the credibility of the witnesses, the weight and value to be given their testimony and any factual issues raised by the evidence are all for the trial court's determination. *Id*. at 456 (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). This Court's review of the trial court's conclusions of law is de novo, with no presumption of correctness. *Id*. at 457-58.

In this case, the trial court concluded that Defendant's counsel at trial was "more than effective" in his representation of Defendant. The court explained that this was a "very difficult case to defend" and that trial counsel did a "very adequate job" with the "egregious" facts of the case, which were that Defendant admitted to shooting the victim without any provocation and showed no remorse and that Defendant wrote and made incriminating letters and phone calls. The trial court concluded that trial counsel "prepared this case, interviewed the witnesses, conferred with [Defendant], and presented the . . . case as well as he could based on the facts that he was presented with." We agree with the trial court.

Defendant's trial counsel testified that he did not observe any behaviors or signs of mental illness in his meetings with Defendant. He described Defendant as "very in control." Dr. Smith's evaluation of Defendant showed that Defendant had exaggerated her symptoms, and in one of Defendant's letters, she wrote that she was going to lie about her symptoms in order to obtain medication.

Furthermore, Defendant has not shown that evidence of her mental state would have been admissible at trial. Ordinarily, expert testimony regarding a defendant's capacity or lack of capacity to form the mental state required for the commission of an offense is admissible if it satisfies "general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997). Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). Interpreting the supreme court's holding in *Hall*, this Court has held that, in order for expert testimony regarding a defendant's mental state to be admissible, "the expert must testify that (1) the defendant has a mental disease or defect and that (2) because of the mental disease or defect, the defendant lacks the capacity to form the requisite mens rea." *State v. Anthony Poole*, No. W2007-00447-CCA-R3-CD, 2009 WL 1025868, at *9 (Tenn. Crim. App. at Jackson, filed April 14, 2009), perm. app. denied (Tenn. Sept. 28, 2009) (citing *Hall*, 958 S.W.2d at 689-91).

In *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005), our supreme court affirmed the trial court's decision to exclude expert testimony where the doctor would have testified that the defendant suffered from a reduced ability to premeditate at the time of the crime. *Id*. at 56. In that case, the supreme court held that the expert's proposed testimony did not meet the prerequisites of *Hall* because the doctor could not testify that the defendant was incapable of intentional and premeditated action. Similarly, relying on *Faulkner* and *Hall*, this Court held that an expert's testimony was inadmissible "because [the expert] did not testify that the appellee completely lacked the mental capacity to commit the crimes. . . ." *State v. Antonio D. Idellfonso-Diaz*, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207 at *4 (Tenn. Crim. App. at Nashville, filed Nov. 1, 2006), perm. app. denied (Tenn. Feb. 26, 2007).

In this case, Dr. Smith acknowledged that she could not conclude that Defendant lacked the ability to premeditate or form the requisite intent to commit the crime. She testified, "[t]he best I can do is say that [sic] what I said in my report which is 'could have.'" Based on Dr. Smith's testimony at the hearing on Defendant's motion for new trial, we conclude that trial counsel was not deficient for failing to present evidence of Defendant's mental state as a defense.

We also conclude that defense counsel was not deficient for failing to assert intoxication as a defense. At the hearing on Defendant's motion for new trial, trial counsel testified that the only witness to testify at trial that Defendant had been using crack cocaine at the time of the offense was Defendant's mother, Sherry Agee. While another witness, Julie Campbell testified that she and Defendant got high on crack cocaine after the shooting, as trial counsel testified, the only other witness who could have testified as to Defendant's drug use prior to or at the time of the shooting was Defendant herself. Moreover, Defendant did not present any evidence at the motion for new trial hearing in support of Defendant's intoxication.

Next, Defendant contends that trial counsel was deficient for not withdrawing as counsel when the State sought to introduce a letter written by Defendant that referenced counsel. Trial counsel testified that he attempted to exclude all of the letters written by Defendant because they were incriminating. However, the trial court allowed into evidence a letter written by Defendant that states:

> Kendrick,
> What the business is Baby? I'm so glad to hear from you, and Congratulations, Daddy. I know a baby from you will Be Beautiful. On a serious tip baby be thankful you only have 2 y[ea]rs. It seems like a long time but in all actuality it's not, your seed will still be young enough for you to raise the right way and you'll still be young enough to get your shit strait! Things are not looking good for me. [*My lawyer says*] I'll be lucky to get 2nd degree because one of the bullets went in "Execution Style!" So I'm going to tell them some shit to get the "Heat of Passion Crime." Shit ya know a Bitch gotta do what a Bitch gotta do to get back to her youngins. For example, I might say he slept w[ith] someone who had AIDS or something and he told me to deal with it! Wouldn't that make you mad enough 2 kill? I know it would me! I don't know yet so please keep me and my 4 babies in your prayers.

In the margin of the letter, Defendant bracketed the portion of the letter in which she wrote about fabricating a defense and wrote, "Erase this part or just throw this page away."

-18-

The trial court redacted Defendant's reference to trial counsel because, as trial counsel asserted, it would have put him in the position of being a possible witness. By redacting only the portion of the letter that states, "[m]y lawyer says," we believe the letter may give the impression that Defendant was admitting in the letter that she had killed the victim "execution style," and therefore, would have been "lucky" to get a conviction for second degree murder. However, Defendant cannot, and does not, assert that trial counsel was ineffective for not seeking to exclude the entire letter because counsel did attempt to suppress the letter prior to trial. Rather, Defendant asserts that trial counsel was ineffective for not moving to withdraw as counsel.

Even assuming arguendo that counsel was deficient for failing to withdraw as counsel, Defendant has failed to show how she was prejudiced by counsel's alleged deficiency. Defendant's new counsel at the hearing on the motion for new trial did not elicit any testimony from trial counsel or present any other proof that would tend to show that 1) had trial counsel filed a motion to withdraw as counsel, the trial court would have granted the motion; or 2) had the motion to withdraw been granted, what trial counsel would have testified to had he been called as a witness at the trial. In order to show prejudice that justifies relief, a defendant must do more than have the court rely on speculation. *See e.g. Joseph DeJuan Webster v. State*, No. M2009-01540-CCA-R3-PC, 2010 WL 2594028 (Tenn. Crim. App. at Nashville, June 28, 2010), *perm. app. denied* (Tenn., Nov. 10, 2010). In cases such as this, there should be some evidence of what would have been submitted as proof at trial if, in fact, trial counsel had rendered effective assistance of counsel.

Defendant has failed to show prejudice by trial counsel's failure to withdraw. A defendant's "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052).

Finally, we conclude that trial counsel was not deficient for, as Defendant generally asserts, failing to adequately develop "a theme, plan, or theory of defense" at trial. The trial court found that trial counsel represented Defendant to the best of his ability given the facts of the case. We agree. Trial counsel testified that he investigated the case, conferred with Defendant, interviewed several witnesses, and developed different theories and defenses; however, those defenses were either not supported by the evidence or were negated by Defendant herself in her letters and phone calls. Furthermore, other than Defendant's mental state and intoxication, which we addressed above, Defendant did not suggest or present evidence of any additional theories or defenses at the motion for new trial hearing. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE